**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

August 7, 2020

Robert S. Saunders, Esquire
Edward B. Micheletti, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square, 920 North King Street
Wilmington, Delaware 19801

William M. Lafferty, Esquire
Kevin M. Coen, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801

RE: ***Realogy Holdings Corp., v. SIRVA Worldwide, et al.*,**
C.A. No. 2020-0311-MTZ

Dear Counsel:

Plaintiff Realogy Holdings Corp. ("Realogy" or "Plaintiff") applied for certification of an interlocutory appeal from the bench ruling issued July 17, 2020 (the "Bench Ruling").[1] The Bench Ruling dismissed Realogy's claims for specific performance because under the governing Purchase and Sale Agreement ("Purchase Agreement"), the unambiguous contractual conditions on that remedy failed.[2] For the following reasons, I recommend against certifying an interlocutory appeal.

---

[1] Docket Item ("D.I.") 78.

[2] D.I. 83 [hereinafter, the "Bench Ruling"].

### I.    Background

#### A.  *The Parties & Procedural History*

Plaintiff Realogy is a "full-service residential real estate services company, including brokerage, franchising, relocation, mortgage, and title and settlement services."[3]  Non-party Cartus Corporation ("Cartus"), Realogy's indirect, wholly-owned subsidiary, "provides relocation counseling to newly-hired or transferring employees of large corporations, logistical relocation support, international assignment compensation services, intercultural and language training, and consulting solutions."[4]

Defendant SIRVA is a "global relocation and moving service provider, providing integrated business-to-business mobility solutions for corporations, government institutions and consumers."[5]  SIRVA is a Madison Dearborn Partners, LLC ("MDP LLC") portfolio company.[6]  MDP LLC acquired SIRVA in 2018.[7] Defendants Madison Dearborn Capital Partners VII-A, L.P., Madison Dearborn Capital Partners VII-C, L.P., and Madison Dearborn Capital Partners VII Executive-

---

[3] D.I. 32 [hereinafter, "Am. Compl."] ¶ 12.

[4] Am. Compl. ¶ 13.

[5] *Id.*  ¶ 22.

[6] *Id.*  ¶ 24.

[7] *Id.*

A, L.P. (collectively, "MDP") are entities through which MDP LLC conducts business.[8] Defendant North American Van Lines, Inc. ("North American," and collectively with SIRVA and MDP, "Defendants") provides moving services and is a SIRVA affiliate.[9]

Under the November 6, 2019, Purchase Agreement between Realogy and SIRVA, SIRVA was to purchase all of Cartus' issued and outstanding shares of common stock for $400 million.[10] MDP provided $125 million in equity financing and a limited guaranty of a termination fee.[11] On December 2, SIRVA and North American entered into an Assignment and Assumption of Agreement, by which SIRVA assigned its rights under the Purchase Agreement to North American.[12] In the context of the COVID-19 pandemic, and as the Purchase Agreement's outside date neared, the relationship between SIRVA and Realogy fractured.[13]

---

[8] *Id.* ¶ 15.

[9] *Id.* ¶ 26.

[10] *Id.* ¶ 9.

[11] *Id.* ¶¶ 52–53, 94, 99–100,

[12] *Id.* ¶ 27.

[13] *See e.g.*, *Id.* ¶¶ 138–141, 148–152.

On April 27, 2020, Realogy filed its Verified Complaint for Breach of Contract ("Original Complaint").[14]  The Original Complaint contains the following counts: (i) breach of contract against SIRVA, seeking specific performance; (ii) in the alternative, breach of contract against all Defendants, seeking the termination fee; and (iii) declaratory judgment, seeking, *inter alia*, declarations that Defendants breached their obligations under the Purchase Agreement and are not excused from performing thereunder.[15]

The next day, Plaintiff filed a motion to expedite.[16]  I heard oral argument on that motion on May 8.[17]  I granted the motion in part, expediting Defendants' anticipated motion to dismiss based on the contractual availability of specific performance to mid-July and expediting trial to November 30 through December 4 of this year.[18]

After the hearing on the motion to expedite, on May 17, Plaintiff filed an Amended Complaint for Breach of Contract ("Amended Complaint").  The Amended Complaint contains the following counts: (i) breach of contract against

---

[14] D.I. 1 [hereinafter, "Compl."].

[15] Compl. ¶¶ 92–112.

[16] D.I. 2.

[17] D.I. 34 [hereinafter, the "MTE Transcript"].

[18] MTE Transcript at 80–82.

SIRVA seeking specific performance of its reasonable best efforts and "iterative steps to close"; (ii) breach of contract against SIRVA seeking specific performance consummating the transaction; (iii) in the alternative, breach of contract against SIRVA for the termination fee; (iv) declaratory judgment against SIRVA; (v) breach of the implied covenant of good faith and fair dealing against SIRVA; and (vi) in the alternative, breach of contract against MDP for the termination fee.[19] Notably, the Amended Complaint did not seek any relief against MDP under the Purchase Agreement.

On June 8, Defendants filed an answer to the Amended Complaint and Verified Counterclaim ("Counterclaim").[20] The next day, Defendants filed a motion to dismiss Counts I and II of the Amended Complaint ("Motion to Dismiss").[21] Plaintiff answered the Counterclaim on July 10.[22] The parties briefed their positions on the Motion to Dismiss, and I heard argument on July 17. Following argument, I gave the Bench Ruling granting the Motion to Dismiss Counts I and II. Realogy's request for interlocutory appeal followed.

---

[19] Am. Compl. ¶¶ 185–220.

[20] D.I. 44.

[21] D.I. 45.

[22] D.I. 61.

B. *The Purchase Agreement*

The provisions of the Purchase Agreement most relevant to the Motion to

Dismiss follow.

In Section 13.8, entitled "Specific Performance and Other Equitable Relief,"

SIRVA and Realogy agreed to several limitations on, and conditions for, obtaining

the remedy of specific performance of the Purchase Agreement.

> (b) Notwithstanding anything to the contrary set forth in this
> Agreement, (i) in no event shall Seller or any of its Representatives
> (including the Acquired Companies prior to the Closing) be entitled to,
> or permitted to seek, specific performance against the Debt Financing
> Sources, except in each case indirectly through the enforcement of
> Buyer's obligations hereunder, and (ii) Seller shall be entitled to bring
> an Action to specifically enforce Buyer's obligation to consummate the
> Closing and Buyer's rights under the Equity Financing Commitments
> to cause the Equity Financing to be funded *if (and only if and for so
> long as)* (**A**) *all of the conditions set forth in Section 10.1 and Section
> 10.2 have been and continue to be satisfied* or (to the extent permitted
> by applicable Law) waived (other than those conditions that by their
> terms or nature are to be satisfied at the Closing, each of which shall
> then be capable of being satisfied at the Closing and the date of
> termination) and Buyer fails to consummate the Closing on the date
> required pursuant to the terms of Section 2.3, (**B**) *the proceeds of the
> Debt Financing (or any alternative debt financing) have been funded
> to Buyer or the agent for the Debt Financing Sources under the Debt
> Financing Commitments (or any definitive agreements executed
> pursuant thereto) has irrevocably confirmed in writing to Buyer that
> the Debt Financing will be funded subject only to the funding of the
> Equity Financing*, (C) Seller has not terminated this Agreement in
> accordance with Article XI and has irrevocably confirmed to Buyer in
> writing that all of the conditions set forth in Section 10.1 and Section
> 10.2 have been and continue to be satisfied or (to the extent permitted

by applicable Law) waived (other than those conditions that by their terms or nature are to be satisfied by actions to be taken at the Closing, each of which shall then be capable of being satisfied at the Closing) and that if the Debt Financing and Equity Financing are funded, then Seller will consummate the Closing in accordance with the terms of this Agreement, and (D) Buyer has failed to consummate the Closing within three (3) Business Days after receipt of such irrevocable confirmation. ***For the avoidance of doubt,*** (a) in no event shall Seller be entitled to specifically enforce (or to bring any Action in equity seeking to specifically enforce) Buyer's rights under the Equity Financing Commitments to cause the Equity Financing to be funded other than as expressly provided in the immediately preceding sentence, and (b) ***in no event shall Seller be entitled to seek to specifically enforce any provision of this Agreement or to obtain an injunction or injunctions, or to bring any other Action in equity in connection with the transactions contemplated by this Agreement, against Buyer other than against Buyer and, in such case, only under the circumstances expressly set forth in this Section 13.8.***[23]

Thus, Realogy is only entitled to seek specific performance against SIRVA; this limitation is reinforced by Section 13.16, which states, "This Agreement may be enforced only against Seller and Buyer."[24] And Realogy may obtain that remedy "if (and only if and for so long as)" under Section 13.8(b)(ii)(A), all closing conditions "have been and continue to be satisfied," and under Section 13.8(b)(ii)(B), the Debt Financing is funded or "irrevocably confirmed in writing."[25]

---

[23] Am. Compl. Ex. A [hereinafter, the "Purchase Agreement"] § 13.8(b) (emphasis added).

[24] *Id.* §§ 13.8, 13.16.

[25] *Id.* §§ 13.8(b)(ii)(A)-(B).

Article X sets forth the closing conditions. Under Section 10.2(b), which Section 13.8(b)(ii)(A) directs must be satisfied for specific performance, the "Seller shall have performed and complied with, in all material respects, each covenant and obligation required by this Agreement to be so performed or complied with by Seller on or before the Closing."[26]

The Purchase Agreement limits the financing SIRVA must seek and provide. Under Section 6.6(e), "subject in all respects to Article XI and Section 13.8(b), [Buyer's] obligations set forth in this Agreement are not contingent or conditioned upon Buyer's, its Affiliate's or any other Person's ability to obtain financing (including the Financing or any Alternative Financing) for or in connection with the Transaction."[27] Section 7.3(c) compels SIRVA to use its reasonable best efforts to obtain alternative financing if debt financing—but not equity financing—becomes unavailable.

> If any portion of the Debt Financing becomes unavailable on the terms and conditions . . . ***Buyer shall use its reasonable best efforts*** to (x) arrange and obtain, as promptly as practicable following the occurrence of such event, alternative financing from the same or alternative sources (the "Alternative Financing") in an amount sufficient to consummate the Transaction with terms and conditions not materially less favorable in the aggregate to Buyer than those set forth in the Debt Financing Commitments (or replace any unavailable portion of the

---

[26] *Id.* § 10.2(b).

[27] *Id.* § 6.6(e).

Financing) and (y) obtain a debt financing commitment letter (including any associated fee letter) with respect to such Alternative Financing, true, accurate and complete copies of which shall be promptly provided to Seller upon execution thereof (which fee letters may be redacted with respect to any interest rates, fee amounts, pricing caps and other similar economic terms (including flex terms) set forth therein). The ***Alternative Financing*** (A) ***shall be sufficient to pay, when added to the Equity Financing and the remaining Debt Financing (if any), the Required Amount*** and (B) shall not include conditions or contingencies that could reasonably be expected to materially impair, delay or prevent or make less likely to occur the funding of the Debt Financing (or satisfaction of the conditions to the Debt Financing) on the Closing.[28]

Section 7.3(e) further states,

Notwithstanding anything contained in this Section 7.3 or anything else in this Agreement, in no event shall the reasonable best efforts of Buyer be deemed or construed to required Buyer to, and Buyer shall not be required to, (x) incur or pay any fees to obtain a waiver or amendment of any term of the Debt Financing Commitments or fees (in the aggregate) in excess of those contemplated by the Debt Financing Commitments as of the date hereof, (y) ***agree to conditionality or economic terms of the Debt Financing Commitments that are less favorable than those contemplated by the Debt Financing*** or related fee letter (including any flex provisions therein) as of the date hereof, or (z) ***seek equity financing from a Person other than the Guarantors or in an amount in excess of the Equity Financing Commitments*** as of the date hereof.[29]

Section 11.3 governs termination of the Purchase Agreement and the termination fee.

---

[28] *Id.* § 7.3(c) (emphasis added).

[29] *Id.* § 7.3(e) (emphasis added).

(a) If this Agreement is terminated (i) by either Seller or Buyer pursuant to Section 11.1(a) and all conditions to Closing set forth in Section 10.1 (other than Section 10.1(a)(i) and other than Section 10.1(b)(to the extent arising under Antitrust Laws)) and Section 10.2 are satisfied or capable of being satisfied or are waived (other than those conditions that by their nature are to be satisfied at the Closing, each of which shall be capable of being satisfied at the Closing and the date of termination), (ii) by either Seller or Buyer pursuant to Section 11.1(b) and the applicable injunction or other order giving rise to such termination right arises under Antitrust Laws, or (iii) by Seller pursuant to (x) Section 11.1(d) or (y) Section 11.1(e), then, in each such case, Buyer shall, no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, to Seller or its designee an amount equal to thirty million dollars ($30,000,000) (the "Termination Fee") without deduction or offset of any kind. Notwithstanding anything to the contrary contained in this Agreement, in no event shall Buyer be required to pay the Termination Fee on more than one occasion.[30]

The Limited Guaranty between Realogy and MDP conditionally guarantees the Termination Fee.[31]

Lastly, the Purchase Agreement defines a material adverse event ("MAE") and its consequences.[32] While this definition plays a role in Plaintiff's overarching theory of the case, it does not inform the Motion to Dismiss.

---

[30] *Id.* § 11.3.

[31] Am. Compl. Ex. B [hereinafter, the "Limited Guaranty"].

[32] Purchase Agreement § 1.1.

### C. The Related Agreements

The Limited Guaranty between Realogy and MDP guarantees the payment of the Termination Fee if the terms and conditions in Section 11.3 of the Purchase Agreement are satisfied.[33] The Limited Guaranty limits Realogy's legal recourse against MDP solely and exclusively to "Retained Claims," as defined to include claims for payment of the Termination Fee.[34] A claim against MDP to enforce the Purchase Agreement is a "Non-Retained Claim."[35] While the Limited Guaranty may terminate upon assertion of a Non-Retained Claim, it permits Realogy to cure that assertion by dismissing the action within ten business days of receiving a "written demand for such withdrawal by [SIRVA]" (the "Cure Provision").[36] In this case, SIRVA never sent Realogy such a written demand because SIRVA believes any claim against it for the termination fee is not valid.[37]

The Equity Financing Commitment Letter ("ECL") between SIRVA and MDP establishes that MDP conditionally agreed to purchase up to $125 million of

---

[33] Limited Guaranty § 1.

[34] *Id.* § 4.

[35] *Id.* § 4.

[36] *Id.* § 6(b).

[37] Bench Ruling at 23–24.

SIRVA equity to finance the transaction ("Equity Financing").[38]  MDP's funding

obligations terminate "automatically and immediately" upon certain events,

including the filing of an action against MDP for anything other than a Retained

Claim.  Section 3 states:

> The ***obligation of the Investors to fund the Commitment shall, in each case, automatically and immediately terminate upon the earliest to occur*** of (a) the Closing. . . (b) the valid termination of the Purchase Agreement in accordance with its terms, (c) ***Seller or any of its Representatives asserting, filing or otherwise commencing any Action against, any Investor Affiliate*** (as defined below) relating to this letter agreement, the Limited Guaranty (as hereinafter defined), the Purchase Agreement, the Debt Financing Commitments or any transaction contemplated hereby or thereby ***other than Retained Claims (as defined in, and to the extent permitted under, the Limited Guaranty)***, in each case, subject to all of the terms, conditions and limitations herein and therein[.][39]

While Realogy is not a party to the ECL, it is explicitly listed as a third-party

beneficiary that can enforce the ECL subject to Section 13.8(b) of the Purchase

Agreement.[40]  The ECL limits Realogy's remedies against MDP to those enumerated

in the Limited Guaranty.[41]

---

[38] Am. Compl. Ex. C [hereinafter, the "ECL"].

[39] *Id.* § 3 (emphasis added).

[40] *Id.* § 7.

[41] *Id.* § 8 ("Seller's remedies against the Investors as set forth in Sections 4(c) and 4(d) under the Limited Guaranty shall, and are intended to, be the sole and exclusive remedy available to Seller and its Affiliates against the Investors or any of their respective Affiliates in respect of any liabilities or obligations arising under, or in connection with,

Lastly, under the Amended Debt Commitment Letter ("DCL") between SIRVA and various lenders, those lenders agreed to fund up to $285 million of the purchase price ("Debt Financing").[42]  The Debt Financing was conditioned on the Equity Financing.[43]  The DCL states that "[p]rior to, or substantially concurrently with," the funding contemplated by the DCL, "[SIRVA] shall have received the Equity Contributions."[44]  The DCL further provides that the lenders' obligations to fund the Debt Financing "automatically terminate … if the initial borrowing thereunder does not occur on or before 11:59 p.m., New York City time, on the date that is five business days after the [April 30, 2020] Outside Date[.]"[45]  The DCL terminated under that provision on May 7, 2020.

### D.  The Timeline of Events

On April 24, 2020, Realogy sent SIRVA a letter stating that "all of the conditions set forth in Sections 10.1 and 10.2 of the Purchase Agreement had been satisfied (with the exception of those conditions that were to be satisfied at closing,

---

the Purchase Agreement or the Transactions from and after termination of the Purchase Agreement.").

[42] Am. Compl. Ex. D [hereinafter, the "DCL"].

[43] *Id.* ¶ 59.

[44] DCL § 6, Ex. C.

[45] *Id.* § 10.

all of which are capable of being satisfied)."[46]  Realogy also stated "that assuming the Debt Financing and Equity Financing are funded," it would "consummate the Closing on April 29, 2020, the third Business Day following the expiration of the Marketing Period, in accordance with the terms of the Purchase Agreement."[47]

The same day, Thomas Souleles of MDP LLC called Realogy's Chief Executive Officer, Ryan Schneider.[48]  Schneider was unable to speak at that time and the two agreed to speak the next morning.[49]  When they spoke, Souleles indicated that SIRVA did not agree with Realogy's April 24 letter, and that SIRVA did not believe all of the conditions in Sections 10.1 and 10.2 of the Purchase Agreement had been satisfied.[50]  SIRVA sought to invoke the Purchase Agreement's MAE provision, pointing to the impact of COVID-19 on Cartus's business.[51]  SIRVA followed this phone call with a letter claiming the Purchase Agreement's MAE provision was triggered because (i) Cartus had been disproportionately

---

[46] Am. Compl. ¶ 153 (quoting Am. Compl. Ex. E).

[47] *Id.* ¶ 153 (quoting Am. Compl. Ex. E).

[48] *Id.* ¶¶ 20, 152, 154.

[49] *Id.* ¶¶ 152, 154.

[50] *Id.* ¶ 154.

[51] *Id.*

impacted by COVID-19[52] and (ii) Realogy will have solvency issues in the future that will prevent it from performing post-closing obligations.[53]

Realogy filed the Original Complaint two days after receiving that letter. The same day, Realogy released a press release entitled, "Realogy Files Litigation Against Madison Dearborn Partners and SIRVA Worldwide to Enforce Commitments Under Purchase Agreement."[54]

On April 28, SIRVA sent Realogy a termination notice stating the Purchase Agreement was terminated effective immediately.[55] SIRVA claimed Realogy breached the Purchase Agreement by seeking specific performance in the Original Complaint when the conditions under Section 13.8 had not been satisfied. SIRVA explained:

> As a result, your filing of the Complaint on April 27, 2020 and the allegations made therein constitute a breach (moreover, a Willful Breach) of the Purchase Agreement by Seller such that the condition set forth in Section 10.2(b) of the Purchase Agreement would not be satisfied at the Closing. Moreover, in light of that improper, unpermitted filing coupled with your accompanying press release and the incalculable harm to SIRVA caused by the many false statements contained therein, such failure is incapable of being cured.[56]

---

[52] *Id.* ¶ 156.

[53] *Id.* ¶ 157.

[54] D.I. 46 at 13, Ex. 5.

[55] Am. Compl. ¶ 166.

[56] *Id.* Ex. G.

SIRVA terminated the Purchase Agreement pursuant to Section 11.1(c), which permits the buyer to terminate the Agreement if "Seller has breached or failed to comply with any of its obligations under this Agreement such that the condition set forth in Section 10.2(b) would not be satisfied at the Closing."[57]

April 30 was the Purchase Agreement's Outside Closing Date.[58] On that day, Realogy sent SIRVA a letter claiming the termination notice was invalid.[59] On May 1, SIRVA sent Realogy a supplemental termination notice[60] stating that since the Outside Closing Date had passed, SIRVA was also terminating the Purchase Agreement under Section 11.1(a).[61] This notice once again alleged Realogy breached the Purchase Agreement by asserting a Non-Retained Claim against MDP.[62]

---

[57] Purchase Agreement § 11.1(c).

[58] *Id.* § 11.1(a).

[59] Am. Compl. ¶ 168.

[60] *Id.* ¶ 169, Ex. I.

[61] Purchase Agreement § 11.1 ("This Agreement may be terminated at any time prior to the Closing: (a) by either Seller or Buyer at or after 11:59 p.m. Eastern Time, on April 30, 2020 (as may be extended pursuant to the immediately following proviso, the "Outside Date") unless the Closing has occurred on or prior to the Outside Date. . .").

[62] Am. Compl. ¶ 169.

On May 7, the Debt Financing expired by its own terms.[63]

### E.  The Bench Ruling

I heard argument on the Motion to Dismiss on July 17.   Following argument, I entered the Bench Ruling granting the Motion to Dismiss.   The Bench Ruling adopted Defendants' reasoning as presented at oral argument, with two exceptions.[64] First, I did not "reach the abstract or doctrinal boundaries of the prevention doctrine because I believe that Realogy, and not SIRVA, caused the conditions to fail by filing the Non-Retained Claims."[65]  Second, I elaborated upon Section 13.8's timing provisions:

---

[63] DCL at 15 ("This Commitment Letter and the commitments hereunder shall automatically terminate in the event that (a) in respect of the Incremental Credit Facilities, if the initial borrowing thereunder does not occur on or before 11:59 p.m., New York City time, on the date that is five business days after the Outside Date (as defined in the Purchase Agreement as in effect on the Original Commitment Letter Date, including any extension of the Outside Date pursuant to the provisio of Section 11.1(a)) thereof (as in effect on the Original Commitment Letter Date)…"); *see also* MTE Transcript at 79.

[64] Bench Ruling at 98–99.

[65] *Id.*

I agree with SIRVA's interpretation of the language "for so long as" and its interpretation of the clause "for the avoidance of doubt" regarding obtaining an injunction. Reading the provision as Realogy suggests would read out the contractual consequences of filing a Non-Retained Claim, which I believe would be an absurd result. And more globally, reading Section 13.8 to have the narrow window of time that Realogy suggests would lead us to the fundamental quandary we discussed at the motion to expedite of ordering specific performance without the contractually requisite equity financing.[66]

The remainder of Defendants' presentation's "exposition, explanation, and reasoning aligned with what I would write in a written opinion."[67] The Motion to Dismiss "turns entirely on the plain text of Section 13.8(b) of the [P]urchase [A]greement, Realogy's [Original Complaint], and the [ECL]. . . It has nothing to do with the MAE issues in the case."[68] Dismissal here "is a matter-of-law determination for the Court based on an unambiguous contract provision and the direct contractual consequences of what Realogy alleged and requested in its [Original Complaint]."[69]

Section 13.8(b)(ii)(B) precludes specific performance of the Purchase Agreement because the proceeds of the Debt Financing have not been funded or

---

[66] *Id.* at 99.

[67] *Id.* at 98.

[68] *Id.* at 4.

[69] *Id.*

irrevocably confirmed in writing to Buyer.[70] The Debt Financing failed because Realogy's Original Complaint terminated the Equity Financing; the Debt Financing also expired under the DCL's own terms on May 7th.[71]

Realogy asks for leniency in characterizing the Original Complaint, but to overlook Realogy's filing would be to "eliminate and change direct contract rights for [MDP] regarding its obligation to fund the equity, when that obligation, quote, 'automatically and immediately' terminated with [the Original Complaint]."[72] The Original Complaint defined "Defendants" as SIRVA and MDP.[73] Count III of the Original Complaint set forth six requests for declaratory judgment.[74] The first request seeks a declaration that "Defendants have breached their obligations under the Purchase Agreement;" the fifth request seeks a declaration that "SIRVA has no right to terminate the Purchase Agreement;" and the sixth seeks a declaration that "the Defendants are not excused from performing their obligations under the Purchase Agreement."[75] The first and sixth requests thus seek declarations against

---

[70] *Id.* at 10–11.

[71] *Id.* at 11.

[72] *Id.* 14–15.

[73] Compl. at 1.

[74] *Id.* ¶ 112.

[75] *Id.*; Bench Ruling at 15–16.

MDP under the Purchase Agreement. Additionally, Realogy's prayer for relief asks the Court to declare that "SIRVA has no valid basis to terminate the Purchase Agreement, the Defendants are not excused from performing their obligations under the Purchase Agreement, and that the Defendants committed material breaches of the Purchase Agreement."[76] The Original Complaint's "declaration and requested relief asking . . . that MDP committed material breaches of the purchase agreement [is] not a [R]etained [C]laim"[77] as defined by the Limited Guaranty.

Under the ECL, filing a Non-Retained Claim against MDP via the Original Complaint had immediate consequences. The ECL states that MDP's equity funding obligation "automatically and immediately terminate[s]" if and when "Seller or any of its Representatives assert[s], fil[es] or otherwise commenc[es] any Action against, any Investor Affiliate (as defined below) relating to this letter agreement, the Limited Guaranty (as hereinafter defined), the Purchase Agreement, the Debt Financing Commitments or any transaction contemplated hereby or thereby other

---

[76] Bench Ruling at 16–17; Compl. at 44–45.

[77] Bench Ruling at 19; *see also* ECL § 3.

than Retained Claims."[78]  Realogy's allegations and requested relief against MDP automatically and immediately terminated the Equity Financing.[79]

Under the unambiguous terms of the ECL, DCL, and Purchase Agreement, the Equity Financing's termination cascades into precluding specific performance. "Realogy itself acknowledges . . . that the lenders' obligations under the [DCL] [are] subject to the condition that SIRVA receives a $125 million equity commitment from MDP."[80]  The Debt Financing was conditioned on the Equity Financing, which terminated; and the Debt Financing would have expired on May 7 in any event. Without the Equity and Debt Financing, the conditions required for specific performance under Section 13.8(b)(ii)(B) can never be met.

Realogy's arguments were peripheral to the core contractual terms.  Four arguments persist in its request for interlocutory appeal.  First, it argued it did not intend to sue MDP under the Purchase Agreement; rather, it simply committed a few scrivener's errors by asserting Purchase Agreement claims against "Defendants."

---

[78] ECL § 3; *see also* Bench Ruling at 19.

[79] Bench Ruling at 22–23; *see also* ECL § 3.

[80] Bench Ruling at 23 (citing Am. Compl. ¶ 59).

The governing agreements are blind to Realogy's intent.[81]   And Realogy's press release precludes a forgiving conclusion that Realogy made a typo.

> [Realogy] meant it because they issued a press release on the very same moment that they filed it, doubling down on exactly what they say is a typographical error. The headline to their press release, issued to the media, put out on a website, says, 'Realogy Files Litigation Against Madison Dearborn Partners And SIRVA Worldwide To Enforce Commitments Under Purchase Agreement.' That's their headline. And in the body of the press release it said exactly what it now tells the Court was a scrivener's error. It said, quote, 'MDP and SIRVA,' leading again with MDP, 'have made false claims in an attempt to avoid their obligations under the purchase agreement.' And they vowed that they will, quote, 'pursue all legal remedies to ensure that SIRVA and MDP honor the commitments made under the purchase agreement.'[82]

Realogy failed to reconcile its purported scrivener's errors with its press release.[83]

Realogy's Original Complaint comprised a Non-Retained Claim against MDP.[84]

---

[81] *Id.* at 16, 89 ("We think it's crystal-clear from the April 27 complaint. They can say it's a scrivener's error, they can say they really didn't mean it, notwithstanding their -- the fact that they flip back and forth from SIRVA in their press release. Their intent doesn't matter. If they filed it, it blew up the equity.").

[82] *Id.* at 17 (quoting D.I. 46 Ex. 5).  I took judicial notice of Realogy's press release announcing the filing of this litigation.  *See In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *4 n.34 (Del. Ch. Aug. 31, 2016) (taking judicial notice of a corporate press release); *see also Jimenez v. Palacios*, 2019 WL 3526479, at *2 n.3 (Del. Ch. Aug. 2, 2019), *as revised* (Aug. 12, 2019), *aff'd, Jimenez v. Palacios*, 2020 WL 4207625 (Del. July 22, 2020) (taking judicial notice of government press statements and releases).

[83] Bench Ruling at 18.

[84] *See id.* at 22.

Second, Realogy argued that the ECL's incorporation of the definition of Retained Claims "as defined in, and to the extent permitted under, the Limited Guaranty"[85] pulls the Limited Guaranty's Cure Provision into the ECL, such that Realogy's amended complaint should obviate its filing of a Non-Retained Claim. But "[t]he notion of a cure provision is directly contrary and inconsistent with the automatic and immediate termination language in the ECL."[86] The ECL "doesn't have a cure provision:"[87] instead, it provides for "automatic and immediate termination" upon the filing of a Non-Retained Claim.[88]

The language Realogy cites does not support incorporation.[89] The ECL addresses "Retained Claims (as defined in, and to the extent permitted under, the Limited Guaranty), in each case, subject to all of the terms, conditions and limitations herein and therein."[90] This language incorporates only the Limited Guaranty's definition, not the Cure Provision. It does not permit Realogy to file Non-Retained Claims against MDP, and then invoke the Cure Provision from the

---

[85] ECL § 3.

[86] Bench Ruling at 20–21; *see also id.* at 90–92.

[87] *Id.* at 20.

[88] *Id.*

[89] *Id.* at 21–22.

[90] ECL § 3 (emphasis added).

Limited Guaranty to eliminate the ECL's plain consequence of automatic and immediate termination.[91] Realogy's attempt to incorporate the Cure Provision of the Limited Guaranty into the ECL fails.

Third, Realogy argued that the Equity and Debt Financing failed because SIRVA claimed a MAE in a last-minute ambush a few days prior to closing.[92] But, under the ECL's plain terms, the Equity Financing automatically and immediately terminated upon filing of the Original Complaint.[93]

> [W]hen Realogy filed these nonretained claims against MDP, they did that on their own, and they blew up the equity and they blew up -- which then blew up the debt. And nothing [SIRVA] did caused or prevented that from happening. No action [SIRVA] took dictated Realogy's choice of litigation strategy, deciding who to sue for what. There's no line to be drawn, none, between SIRVA sending Realogy a letter about concerns of the deal on April 25th and Realogy's choice to sue Madison Dearborn Partners to enforce the purchase agreement on April 27th. They promised that they'd never do that ever under any circumstances, and they did. They didn't even have to sue MDP at all. They didn't have to, but they did and they chose that, and that filing had automatic and immediate consequences.[94]

---

[91] Bench Ruling at 22.

[92] Am. Compl. ¶¶ 158, 160-162, 184.

[93] Bench Ruling at 7.

[94] *Id.* at 27–28.

Realogy's filing of the Non-Retained Claim, not SIRVA's purported "last-minute ambush," terminated the Equity Financing, which caused a condition of the Debt Financing to fail, as well as the conditions to specific performance.

Finally, Realogy argued that the Purchase Agreement's reasonable best efforts provisions require SIRVA to perform its financing obligations.[95] Realogy misreads the Purchase Agreement. SIRVA is required to use its reasonable best efforts to arrange and obtain Alternative Financing only in an amount "sufficient to pay . . . when added to the Equity Financing and the remaining Debt Financing . . . the Required Amount[.]"[96] Because Realogy filed a Non-Retained Claim, "[t]he equity financing is now gone forever. . . [s]o there's nothing for alternative financing to be additive to."[97] Additionally, under Section 7.3(e), SIRVA is not obligated to obtain new equity financing.[98] The "whole notion of alternative financing. . . blew up when [Realogy] blew up [the] equity. Once [Realogy] filed [a Non-Retained Claim]

---

[95] In a footnote, Realogy also hints that SIRVA should not be aligned with MDP in this action because Section 7.3(d) of the Purchase Agreement required SIRVA to use its reasonable best efforts, including through litigation, to maintain the ECL in effect. D.I. 78 at 14 n.5. But the terms of the ECL itself terminated the Equity Financing automatically and immediately. Maintaining the ECL in effect is incongruous with overlooking its plain termination requirements.

[96] Bench Ruling at 25 (citing Purchase Agreement § 7.3(c)(A)).

[97] *Id.*

[98] *Id.* (citing Purchase Agreement § 7.3(e)).

against MDP, that eliminated the equity to the deal, and that equity is a condition of the debt."[99]  In the absence of Equity Financing, SIRVA has no obligation to seek Alternative Financing.

## II. Analysis

Supreme Court Rule 42(b)(i) provides that "[n]o interlocutory appeal will be certified by the trial court or accepted by [the Supreme] Court unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[100]  "Interlocutory appeals should be exceptional, not routine, because they disrupt the normal procession of litigation, cause delay, and can threaten to exhaust scarce party and judicial resources."[101]  Under Supreme Court Rule 42(b)(iii), this Court's analysis should include whether:

> (A) The interlocutory order involves a question of law resolved for the first time in this State; (B) The decisions of the trial courts are conflicting upon the question of law; (C) The question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order; (D) The interlocutory order has sustained the controverted jurisdiction of the trial court; (E) The interlocutory order has reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and a

---

[99] *Id.* at 26.

[100] Supr. Ct. R. 42(b)(i).

[101] Supr. Ct. R. 42(b)(ii).

> review of the interlocutory order may terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice; (F) The interlocutory order has vacated or opened a judgment of the trial court; (G) Review of the interlocutory order may terminate the litigation; or (H) Review of the interlocutory order may serve considerations of justice.[102]

After considering the Supreme Court Rule 42(b)(iii) factors and the Court's "own assessment of the most efficient and just schedule to resolve the case," the Court "should identify whether and why the likely benefits of interlocutory review outweigh the probable costs, such that interlocutory review is in the interests of justice. If the balance is uncertain, the trial court should refuse to certify the interlocutory appeal."[103]

Here, the Bench Ruling does not present any substantial issue of material importance to merit appellate review before a final judgment. "As a general matter, issues of contract interpretation are not worthy of interlocutory appeal."[104] The Motion to Dismiss required me to interpret the unambiguous provisions of the Purchase Agreement and related agreements. In dismissing Counts I and II, I determined that Realogy's assertion of a Non-Retained Claim in the Original

---

[102] Supr. Ct. R. 42(b)(iii).

[103] Supr. Ct. R. 42(b)(iii).

[104] *REJV5 AWH Orlando, LLC v. AWH Orlando Member, LLC*, 2018 WL 1109650, at *3 (Del. Ch. Feb. 28, 2018).

Complaint triggered a series of events culminating in the failure of unambiguous contractual conditions required for specific performance under the Purchase Agreement. Standard contract interpretation issues are not suited for interlocutory appeal.[105] As a "mere contract dispute," that should "end it there."[106] On the threshold requirement of a substantial issue of material importance, alone, I recommend against Plaintiff's application.

For completeness, I also consider the factors set forth in Supreme Court Rule 42(b)(iii). These factors reinforce my recommendation. Plaintiff addresses only Supreme Court Rule 42(b)(iii)(A), (B), and (H) as favoring its application. None of the factors Plaintiff addresses, nor the five others, support an interlocutory appeal. My analysis follows by factor.

> A. The appeal does not involve a question of law resolved for the first time

---

[105] *See Lexington Ins. Co. v. Almah LLC*, 167 A.3d 499 (Del. 2016) (TABLE) (denying interlocutory appeal upon noting the "dispute turn[s] on issues of contract interpretation"); *Robino–Bay Court Plaza, LLC v. West Willow–Bay Court, LLC*, 941 A.2d 1019 (Del. 2007) (TABLE) (declining to grant interlocutory appeal of this court's construction of the operative contract); *McKnight v. USAA Cas. Ins. Co.*, 872 A.2d 959 (Del. 2005) (TABLE) (declining interlocutory appeal where "the trial court applied well-established principles of contract interpretation and thus the case did not involve a matter of first impression"); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 1830476, at *2 n.3 (Del. Ch. Apr. 20, 2015) ("The Court's contract interpretation, even if wrong, would not seem to warrant interlocutory appeal.").

[106] *Steadfast Ins. Co. v. DBi Servs., LLC*, 2019 WL 3337127, at *2 (Del. Super. July 25, 2019) (denying application for interlocutory review).

in Delaware. The dismissal was based on straightforward interpretations of contractual terms and Realogy's Original Complaint. Realogy argues that no "authority supports the notion that even the slightest pleading imprecision can cause the avalanche of dire consequences"[107] seen here, but this argument misconstrues the issues. Realogy's plain breach of unambiguous contractual language pushed over the first domino in a series of contractual consequences. Additionally, while Realogy argues that its theory incorporating the Cure Provision into the ECL makes this case unique, that argument further demonstrates that this is a straightforward contract interpretation case.[108] When, a "trial court applie[s] well-established principles of contract interpretation," "the case [does] not involve a matter of first impression."[109] This factor weighs against certifying the interlocutory appeal.

B.     Trial court decisions do not conflict on the substance of the Bench Ruling. Plaintiff has not identified any Delaware decision to the contrary. The Bench Ruling did not address or rely on Delaware's pleading standards. It traced the direct and immediate contractual consequences of Realogy's

---

[107] D.I. 78 ¶ 22.

[108] D.I. 78 ¶ 23.

[109] *McKnight v. USAA Cas. Ins. Co.*, 872 A.2d 959 (Del. 2005) (Table).

Original Complaint. *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.* does not conflict with the Bench Ruling.[110] In *Hexion*, the financing had not terminated and thus, the transaction could still be consummated.[111] But under the governing merger agreement, even if all "conditions precedent to closing [we]re met, Hexion [would] remain free to choose to refuse to close."[112] Because the seller had agreed to forego specific performance, the Court ordered Hexion "to specifically perform its obligations under the merger agreement, other than the obligation to close."[113] This order placed the parties in the same situation on closing day as they would have been if all parties had performed and satisfied all of the closing conditions. In *Hexion*, as here, the Court considered the seller's request for specific performance "to the extent

---

[110] 965 A.2d 715 (Del. Ch. 2008).

[111] *See id.* at 758 ("Thus, if the other conditions to closing are met, Hexion will be obligated to call upon the lending banks to perform on their funding obligations. In that circumstance, the banks will then have to choose whether to fund on the basis of the solvency letter delivered by Huntsman or, instead, reject that letter as unsatisfactory and refuse to fund. If the lending banks refuse to fund, they will, of course, be opening themselves to the potential for litigation, including a claim for damages for breach of contract.").

[112] *Id.* at 761.

[113] *Id.* at 761–62 ("The issues in this case relate principally to the cost of the merger and whether the financing structure Apollo and Hexion arranged in July 2007 is adequate to close the deal and fund the operations of the combined enterprise. The order the court is today issuing will afford the parties the opportunity to resolve those issues in an orderly and sensible fashion.").

permitted by the merger agreement itself."[114]

But here, SIRVA's reasonable best efforts to obtain Alternative Financing would not and could not lead to closing because Alternative Financing alone, without Equity Financing, will not satisfy conditions to closing or to specific performance. The immediate and automatic consequences of filing a Non-Retained Claim cannot be undone. SIRVA and Realogy cannot possibly be placed in the same situation on closing day as they would have been if all parties had performed and satisfied all of the closing conditions.

Plaintiff also takes issue with the form of the Bench Ruling. In resolving a straightforward, but multifaceted, contractual issue, I strove to maintain this Court's commitment to meaningful expedition even during a pandemic. I did so by leveraging, and distinguishing, Defendants' counsel's accurate, organized, and measured explanation.[115] I believe the Bench Ruling "ma[d]e a record to show what factors [I] considered and the reasons for [my]

---

[114] *Id.* at 722, 760.

[115] *Compare Ball v. Div. of Child Support Enf't*, 780 A.2d 1101, 1104 (Del. 2001) (rejecting a trial court order that adopted a brief in fourteen words without comment); *B.E.T., Inc. v. Bd. of Adjustment of Sussex Cty.*, 499 A.2d 811, 811 (Del. 1985) (rejecting a trial court order adopting, without further explanation, a brief "in those portions which are appropriate to adopt").

decision."[116]  Based on the nuances of Realogy's application, it appears Realogy understands those factors and reasons.  For my part, I do not believe the Bench Ruling's form alone warrants interlocutory appeal, particularly where the substance does not.

C.    The question of law does not relate to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by the Supreme Court in advance of an appeal from a final order, and Plaintiff identifies none. This factor weighs against certifying the interlocutory appeal.

D.    The Bench Ruling does not sustain the controverted jurisdiction of the trial court, and Plaintiff does not argue that it does.[117]  This factor weighs against certifying the interlocutory appeal.

E.    The Bench Ruling does not reverse or set aside a prior decision of the

---

[116] *See B.E.T.*, *Inc.*, 499 A.2d at 811 (quoting *Storey v. Camper*, 401 A.2d 458, 466 (Del. 1979); *accord*, *Ball*, 780 A.2d at 1104; *see also B.E.T.*, *Inc.*, 499 A.2d at 811 (citing *Ademski v. Ruth*, 229 A.2d 837, 838 n.1 (Del. 1967)) ("[a] judge may state [her] reasons briefly").

[117] Since I have determined the equitable claims for specific performance fail, the only remaining issues are legal in nature, and "either party may elect to transfer this matter back to an appropriate court [*i.e.* Superior Court]." *Draper v. Westwood Development Partners, LLC*, 2010 WL 2432896, at \*5 (Del. Ch. June 3, 2010).

trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and review of the interlocutory order will not terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice. Plaintiff does not address this factor. This factor weighs against certifying the interlocutory appeal.

F.      The Bench Ruling does not vacate or open a judgment of the trial court. Plaintiff does not address this factor. This factor weighs against certifying the interlocutory appeal.

G.      Review of the Bench Ruling will not terminate the litigation. The Bench Ruling disposes of two counts seeking specific performance, but does not address the remaining four counts in the Amended Complaint and six counts in the Counterclaim still pending in this litigation. An interlocutory appeal would not terminate the litigation. This element weighs against certifying the interlocutory appeal.

H.      Considerations of justice will not be served by an interlocutory appeal. Contrary to Realogy's argument, I did not apply a "hyper-technical pleading

standard" in the midst of a pandemic.[118]  I applied well-established principles of contractual interpretation to an unambiguous contract.

Further, Realogy now claims it needs immediate review of the Bench Ruling to avoid injustice from the passage of time.[119]  But, in opposing the Motion to Dismiss, Realogy argued that the Court should "defer consideration and determination" of the specific performance issues until after trial to allow discovery on liability.[120]  Realogy's new desire for speed rings hollow.  The potential efficiencies or benefits of an interlocutory appeal do not outweigh the costs.

Considering all of the factors under Supreme Court Rule 42(b)(iii), I believe the balance weighs against certifying the interlocutory appeal.  I recommend against certification.

---

[118] D.I. 78 ¶ 33.

[119] *Id.*

[120] D.I. 57 at 28.

### III. Conclusion

For the following reasons, I recommend against Plaintiff's application for certification of an interlocutory appeal. To the extent an order is required to implement this decision, **IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*